```
           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MARYLAND

ANNISNICOLE WILLIAMS            *

          Plaintiff             *

     vs.                        *    CIVIL ACTION NO. MJG-13-2947

HOME PROPERTIES, L.P. et al.    *

          Defendants            *

*    *    *    *    *    *    *    *    *
```

MEMORANDUM AND ORDER RE: ARBITRATION

The Court has before it Defendant J.C. Ehrlich's Motion to Dismiss the Third Party Complaint and/or to Compel Arbitration of Third Party Plaintiff's Claims [Document 43], Home Properties' Opposition to Third Party Defendant J.C. Ehrlich's Motion to Dismiss the Third Party Complaint and/or to Compel Arbitration of Third Party Plaintiff's Claims and Cross-Motion for Summary Judgment [Document 45], Third Party Defendant J.C. Ehrlich Co., Inc.'s Motion to Strike Home Properties' Surreply [Document 49], and the materials submitted relating thereto. The Court finds a hearing unnecessary.

I.  BACKGROUND

Plaintiff Annisnicole Williams ("Williams") rented an apartment (the "Unit") in the Hunters Glen Apartments ("Hunters Glen"), a subsidiary of Defendant / Third Party Plaintiff Home

Properties, L.P. ("Home Properties").  Shortly after taking occupancy, Williams was bitten by bedbugs and vacated the Unit.

As discussed herein, before - and after – Williams' tenancy, Home Properties contracted with Third Party Defendant J.C. Ehrlich Co., Inc. ("JCE") for pest control services, including, but not limited to, bedbug treatments, at Hunters Glen generally and in the Unit specifically.

Williams filed the case against Home Properties in the Circuit Court for Frederick County, Maryland, and Home Properties removed to this Court.  In the Complaint, Williams asserted claims in four Counts, of which two remain pending[1]:

        Count I        Negligence

        Count II       Maryland Consumer Protection Act

Home Properties filed a Third Party Complaint, [Document 26], against JCE, asserting claims in three Counts:

        Count I        Contractual Indemnification

        Count II       Common Law Indemnification

        Count III      Contribution

---

[1] In the Memorandum and Order Re: Remand and Dismissal, [Document 21], issued December 30, 2013, the Court dismissed all claims against Melissa LaChance, the Hunters Glen Property Manager, and dismissed a battery claim against Home Properties in Count IV.
  In the Memorandum and Order Re: Partial Summary Judgment, [Document 59], issued June 23, 2015, the Court granted summary judgment to Home Properties on Williams' claims in Count III (Fraudulent Concealment) and on the claims for punitive damages.

II.  ARBITRATION LEGAL STANDARD

   A.  Applicable Rule

By the instant motion, JCE seeks dismissal of all claims in the Third Party Complaint, contending that the Court lacks jurisdiction by virtue of an arbitration clause in a Bed Bug Limited Service Agreement between JCE and Hunters Glen dated July 16, 2012.  JCE seeks dismissal pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure "on the grounds that the parties have contractually agreed to binding arbitration."[2] [Document 43] at 1.

It appears that there could be an academic debate as to which Rule of the Federal Rules of Civil Procedure - e.g., Rule 12(b)(1) [subject matter jurisdiction], Rule 12(b)(6) [failure to state a claim], and/or Rule 56 [summary judgment] - is applicable, or most applicable, when a defendant seeks dismissal based on the presence of a mandatory arbitration provision.  See 5B Wright & A. Miller, Federal Practice & Procedure § 1350, nn. 14-15 (3d ed. 2004) (collecting cases).  However, inasmuch as the issue before the Court is the extent to which, if at all, the Court has jurisdiction over the claims in the Third Party

---

[2]  JCE's motion indicates that it seeks dismissal "pursuant to Fed.R.Civ.P. 12(b)(1) and (3)." [Document 43] at 1 (emphasis added).  However, it appears that the reference to Rule 12(b)(3) was a typographical error, as JCE's Memorandum of Points and Authorities, [Document 43], addresses only Rule 12(b)(1) - lack of subject matter jurisdiction and makes no mention of 12(b)(3) - improper venue.

Complaint, the Court would, in any event, find Rule 12(b)(1) most appropriate. See [Document 15] in TECH USA, Inc. v. Belbot, et al., MJG-10-2351.

### B. Legal Setting

The Federal Arbitration Act reflects a strong federal policy favoring arbitration, and courts are thus required to "rigorously enforce agreements to arbitrate." Shearson/American Exp., Inc. v. McMahon, 482 U.S. 220, 226 (1987). However, this liberal policy does not operate to compel arbitration of issues that do not fall within the scope of the parties' arbitration agreement.

Before compelling an unwilling party to arbitration, a court must "'engage in a limited review to ensure that the dispute is arbitrable - i.e., that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement.'" Murray v. United Food and Commercial Workers Intern. Union, 289 F.3d 297, 302 (4th Cir. 2002) (citation omitted). "The 'heavy presumption of arbitrability requires that when the scope of the arbitration clause is open to question, a court must decide the question in favor of arbitration.'" Levin v. Alms & Assocs., Inc., 634 F.3d 260, 266 (4th Cir. 2011) (citation omitted).

The party seeking to arbitrate must establish only two facts: "(1) [t]he making of the agreement and (2) the breach of the agreement to arbitrate."  Mercury Constr. Corp. v. Moses H. Cone Mem'l Hosp., 656 F.2d 933, 939 (4th Cir. 1981).  The Court must particularly "avoid reaching the merits of arbitrable issues."  Id. (citation omitted).

III. DISCUSSION

   A.   Pertinent Background

The following chronology sets forth the pertinent events.

Apr. 21, 2011   Home Properties signed a Contractor Agreement ("2011 Contract") with JCE, which states:

> [JCE] agrees to . . . [p]rovide pest control operations [at Hunters Glen]. . . . Service shall be one time each week to include one building 6 units and up to 1 additional units for a total of 7 units.
>
> [JCE] shall begin work May 1st 2011 or, or at the discretion of the owner this agreement shall become null and void. Work shall be completed in a timely manner, but in no event later than April 30, 2012.
>
> [Home Properties] agrees to pay [JCE] . . . the sum of Two Thousand One Hundred Eighty Four Dollars ($2184.00) [in] Monthly installments of $182.00 per month.

> The scope of work for the 2011 Contract states that the "Pest Problem to be Treated" was: "Rats, mice, roaches, ants, silverfish" on a weekly basis, rotating through the units at Hunters Glen.  The "Prescribed Service" section also states "[$]320 per unit for bedbugs."

5

                The 2011 Contract contained an Indemnification Provision, which states:

> (c) Indemnification. To the fullest extent permitted by law, [JCE] agrees to defend, indemnify, and hold harmless [Home Properties], its affiliates, assigns, directors, officers, agents, and employees from and against any and all claims, damages (including property damage and loss of use of such property), losses, fines, or penalties (Including related costs, expenses, and reasonable attorney fees) that may arise in whole or part from [JCE]'s work on behalf of [Home Properties]. This includes claims, demands, damages, losses, fines, or penalties for Injuries to persons *or* damage to property, including theft, resulting from [JCE]'s acts or omissions or the acts or omissions of those persons or products furnished by [JCE].

| | |
|---|---|
| <u>Apr. 30, 2012</u> | Date by which pest control services contracted for in the 2011 Agreement was to be completed. |
| <u>July 16, 2012</u> | Tracy Walker, an Assistant Property Manager at Hunters Glen, signed a Bed Bug Limited Service Agreement ("July 2012 Bedbug Agreement") with JCE for "the periodic treatment of existing bed bug infestations" in the Unit to "treat all areas – 3 visits" for $320. |

                The July 2012 Bedbug Agreement contains a mandatory arbitration clause on the reverse side that states:

> Mandatory Arbitration. Claims, dispute and other matters in question between the parties to this agreement arising out of or relating to the agreement or warranty shall be submitted to arbitration by a single neutral arbitrator. The customer's damages in any arbitration or lawsuit shall be limited to the costs of labor and materials incurred in connection with this agreement.

6

Aug. 8, 2012       1st attempt to treat the Unit – JCE did not treat because prior tenant did not have Unit prepared.

Aug. 15, 2012      1st treatment - 11 to 25 bedbugs, "[i]nspected and treated throughout interior baseboards, sofa, mattress," but other areas "not prepared"

Aug. 22, 2012      2nd treatment – 11 to 25 bedbugs, "treatment to accessible areas only"

Sept. 4, 2012      3rd treatment – 2 bedbugs, treated multiple areas

Oct. 16, 2012      Email from Hunters Glen Property Manager Melissa Ellison, née LaChance ("LaChance/Ellison") to Jeff Patterson at JCE regarding the Unit: "We need to treat this vacant unit tomorrow please. This is the unit we had down for a while treating while vacant. . . . Not sure why after 3 treatments it still had BB's but need to get rid of them before new clients move in."

Oct. 17, 2012      4th treatment – 11 to 25 bedbugs – "heavy activity in bedroom"

Oct. 22, 2012      Email from LaChance/Ellison to Hunters Glen staff stating that the Unit was infested with bedbugs and the prospective tenant had to "find another apartment."

Dec. 4, 2012       Hunters Glen informed Williams that she would be living in the Unit instead of in the apartment she originally rented.

Dec. 15, 2012      Williams moved into the Unit.

Dec. 23, 2012      Williams woke up with bedbug bites.

Dec. 27, 2012      Hunters Glen signed a Bed Bug Limited Service Agreement ("December 2012 Bedbug Agreement") with JCE for the Unit to "treat all areas – 3 visits. 14 days apart" for $320.  The Unit was treated on January 2, 2013, January 16, 2013, and January 30, 2013.  [Document 43-2] at 6.

　　　　　　　　　　JCE suggested to Hunters Glen that Williams brought the bedbugs with her.

7

       LaChance/Ellison emailed Hunters Glen staff stating: "NO [WILLIAMS] DID NOT [BRING THE BEDBUGS]! THE UNIT WAS INFESTED WITH THEM FROM THE PREVIOUS RESIDENTS AND EHRLICH TREATED IT SEVERAL TIMES."

<u>Jan. 3, 2013</u>  Williams vacated the Unit.

  B. <u>The Binding Arbitration Agreement</u>

  The Court finds that the July 2012 Bedbug Agreement is, as JCE contends, "a valid, binding and enforceable Arbitration Agreement." [Document 43-1]. The Court further finds that Home Properties' efforts to avoid compliance with this agreement are without merit.

  Home Properties contends that the Hunters Glen employee who signed the July 2012 Bedbug Agreement did not have the authority to bind Home Properties to a contract. <u>See</u> [Document 45-1] at 6. Tracy Walker ("Walker"), an Assistant Property Manager at Hunters Glen, signed the July 2012 Bedbug Agreement under the Acceptance of Agreement, which states: "The Above Quotations are Hereby Accepted, Including Terms and Conditions as Found on the Reverse Side." The reverse side of the agreement contains the mandatory arbitration clause.

  The only evidence that Home Properties has offered to support its argument that Walker was not authorized to execute a contract on behalf of Home Properties (here, via Hunters Glen) is the Affidavit of Hunters Glen Property Manager

8

LaChance/Ellison. That affidavit states, in conclusory terms, that "Ms. Walker had no authority to execute a contract on behalf of Home Properties." LaChance/Ellison Aff. ¶ 8. The affidavit is not sufficient even to create the need for an evidentiary hearing. This is supported by the fact that five months later, Hunters Glen and JCE entered into the December 2012 Bedbug Agreement to provide additional bedbug treatments to the Unit.

LaChance/Ellison acknowledges in her affidavit that "Ms. Walker had authority to sign work orders reflecting that a vendor such as [JCE] had completed its work and should be paid." Id. Even if Walker lacked actual authority to bind Home Properties to a contract, she had apparent authority to do so. Indeed, JCE and Hunters Glen acted as if the July 2012 Bedbug Agreement that Walker signed was a valid agreement[3] – JCE treated the Unit, and Hunters Glen paid for those services. Cf. Tobacco Tech., Inc. v. Taiga Int'l N.V., 626 F. Supp. 2d 537, 548 (D. Md. 2009) ("An agent is imbued with apparent authority to bind his or her principal if a third person could reasonably interpret acts or omissions of the principal as indicating that the agent has authority to act on behalf of the principal." (quoting Crothers v. Commodity Futures Trading Comm'n, 33 F.3d

---

[3] Rather than, as Home Properties contends, a mere "work order" used as a "matter of convenience." See [Document 45-1] at 3-4.

9

405, 410 (4th Cir. 1994)).  Furthermore, Hunters Glen and JCE entered into a contract substantially identical to the July 2012 Bedbug Agreement in December 2012.

Home Properties contends that "[f]ollowing the date of the [2011 Contract] the parties continued to act as thought (sic) it was in full force and effect[, and a]s such, the contract renewed."  [Document 45] at 1-2.  The contention is meritless.

Home Properties has presented no evidentiary support for its conclusory contention - and the conclusory statement by LaChance/Ellison – that the 2011 Contract extended past the agreed upon "finish by date" of April 30, 2012.  Moreover, the fact, as found by the Court, that Home Properties (via Hunters Glen) entered in the July 2012 Bedbug Agreement, resolves the matter.

Home Properties presents the somewhat obscure contention that the July 2012 Bedbug Agreement cannot be a valid agreement because no consideration was offered since the 2011 Contract states that bedbug service cost $320, the same price as set forth in the July 2012 Bedbug Agreement.  Prior to the parties entering into the July 2012 Bedbug Agreement, there was – pursuant to the Court's rejection of Home Properties' contention that the 2011 Contract remained in effect - no contract between the parties.  Hence, the July 2012 Bedbug Agreement was an

10

agreement in which JCE gave consideration by offering to perform specified services for an agreed upon price.

Finally, the 2011 Contract states that the "Pest Problem to be Treated" was: "Rats, mice, roaches, ants, silverfish." The "Prescribed Service" section lists the cost of bedbug services, but provides no specification as to what bedbug treatment entails.  See [Document 45-2] at 5.  The terms of the bedbug service set forth in the July 2012 Bedbug Agreement differ from the general pest control terms of service in the 2011 Contract. Compare [Document 43-2] at 5 (July 2012 Bedbug Agreement – specific to the Unit "treat all areas – 3 visits") with [Document 45-2] at 5 (2011 Contract – general to Hunters Glen "weekly service – 6 units (1 bldg) + 1 extra as need – rotate through units").  And, of course, the July 2012 Bedbug Agreement gave Home Properties - as well as JCE - the right and obligation to have disputes determined through arbitration.

### C.   Scope of the Arbitration Agreement

The Court finds that the July 2012 Bedbug Agreement constitutes a valid agreement to submit any disputes that fall within the scope of the agreement to arbitration.  The Court "may not deny a party's request to arbitrate an issue 'unless it may be said with positive assurance that the arbitration clause

11

is not susceptible of an interpretation that covers the asserted dispute.'" Long v. Silver, 248 F.3d 309, 316 (4th Cir. 2001).

The mandatory arbitration clause in the July 2012 Bedbug Agreement states that "[c]laims arising out of or relating to the agreement . . . shall be submitted to arbitration by a single neutral arbitrator." [Document 43-2] at 7.

The claims asserted in the Third Party Complaint are based on JCE's alleged negligence, or inadequate performance of its obligations, in performing bedbug treatments to the Unit in August, September, and October 2012.  See Third Party Compl. ¶¶ 6-7, 10.  Those claims plainly arise out of, or are related to, services provided by JCE pursuant to July 2012 Bedbug Agreement.

IV.    CONCLUSION

For the foregoing reasons:

1. Defendant J.C. Ehrlich's Motion to Dismiss the Third Party Complaint and/or to Compel Arbitration of Third Party Plaintiff's Claims [Document 43], is GRANTED.  The Third Party Complaint is, hereby, DISMISSED.

2. Home Properties' Opposition to Third Party Defendant J.C. Ehrlich's Motion to Dismiss the Third Party Complaint and/or to Compel Arbitration of Third Party Plaintiff's Claims and Cross-Motion for Summary Judgment [Document 45], is DENIED AS MOOT.

3. Third Party Defendant J.C. Ehrlich Co., Inc.'s Motion to Strike Home Properties' Surreply [Document 49], is DENIED AS MOOT.

SO ORDERED, on Monday, June 29, 2015.

                                    _____/s/_____
                                      Marvin J. Garbis
                                 United States District Judge